IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 13, 2001 Session

## STATE OF TENNESSEE v. MARQUIS DAY

**Appeal from the Circuit Court for Madison County**
**No. 97-755     Franklin Murchison, Circuit Court Judge**

---

**No. W2000-01618-CCA-R3-CD - Filed November 9, 2001**

---

The defendant appeals his convictions for first degree murder, conspiracy to commit first degree murder, tampering with or fabricating evidence and unlawful possession of a weapon. He challenges the sufficiency of the convicting evidence based on accomplice testimony, the issue whether Brian Morrow was in fact an accomplice, the admission of graphic photographs of the decedent, and the actions of the trial judge as thirteenth juror. We affirm the judgment of trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CORNELIA A. CLARK, SP. J., delivered the opinion of the court, in which JOE G. RILEY and NORMA McGEE OGLE, JJ., joined.

Jan R. Patterson, Clayton F. Mayo, and George Martin Googe, District Public Defender, Attorneys for Appellee, Marquis Day.

Paul G. Summers, Attorney General, Mark E. Davidson, Assistant Attorney General, James G. (Jerry) Woodall, District Attorney General, and Al Earls, Assistant District Attorney General, attorneys for Appellee, State of Tennessee.

**OPINION**

**Facts**

On July 9, 1997, Milton Herron was stabbed and shot to death in the home occupied by Brenda DeBerry and her juvenile son, Montrell. The DeBerrys, appellant Marquis Day, then also a juvenile, and a third juvenile, Brian Morrow, were arrested and charged with first degree murder, conspiracy to commit first degree murder, fabrication of evidence, and unlawful possession of a weapon. A juvenile transfer hearing for the appellant was conducted on July 30, 1997. By order dated August 1, 1997, the appellant was transferred to the Circuit Court of Madison County to be

tried as an adult. Co-defendant Brian Morrow entered into a plea agreement in juvenile court and agreed to testify against his three co-defendants at trial. Appellant's trial began October 4, 1999.

Brian Morrow[1] was 16 years old at the time of the shooting in July 1997. He had known appellant Marquis Day and Montrell DeBerry for several years. Prior to this offense, he had never been in any criminal trouble.

Morrow testified that on the evening of July 8 and the early morning hours of July 9, 1997, he was at the residence of Brenda and Montrell DeBerry in Jackson, Madison County, Tennessee. The appellant was also present. Morrow arrived around 9:00 p.m., and began watching television with the other three individuals. While there, he listened to a conversation in which the DeBerrys and the appellant discussed their intention to kill Milton Herron. Morrow understood that the plan to kill Herron was related to a dispute over a pistol which they had previously taken from him. Morrow observed two pistols and a .12 gauge sawed-off shotgun in the home. Although Morrow was disconcerted by the conversation, he did not leave, because he believed that the three other individuals would follow him and perhaps harm him if he tried to leave.

While the conversation was being conducted, the telephone rang. Montrell DeBerry answered the phone. Morrow could hear him speaking to someone who apparently advised that he was on his way over to get the gun.

About fifteen minutes later Milton Herron arrived at the DeBerry residence and knocked on the door. Brenda DeBerry answered the door. Her son went to the kitchen. Ms. DeBerry asked Herron to raise his shirt, and then she patted him down, apparently searching for a weapon. Herron entered the living room. According to Morrow, Montrell DeBerry then came into the room carrying a hand pistol, and the appellant came in carrying a knife. The appellant stabbed the victim in the back, and DeBerry shot him in the chest five or six times. Herron spoke, asking why they were taking these actions. He remained standing for a couple of minutes, then began hollering and finally fell down. The appellant then took a sawed-off shotgun and hit the victim in the head several times.

At that point Brian Morrow left the house through the side door. As he stepped outside he heard a shotgun blast. Morrow walked toward the home of Calvin Albea. He encountered Kenneth McCallister, who was walking down the street. McCallister inquired what was happening in the house. Morrow responded that he had not done anything, and then rode off on a bicycle.

Morrow testified that shortly thereafter he observed the appellant and the DeBerrys leave the house. Montrell DeBerry drove off in the blue pickup truck in which Mr. Herron had arrived. The appellant rode in the passenger seat of that vehicle. Brenda DeBerry followed in her own automobile. They disappeared from sight. About ten minutes later Ms. DeBerry returned in her car. Both her son and the appellant were passengers in the car with her. The three individuals instructed

---

[1]The name was spelled "Marrow" and "Morrow" in different parts of the transcript. This court has chosen to use the spelling contained in the indictment.

Morrow to get into the car with them, and he did. The four individuals drove to Wal-Mart, where they purchased cleaning supplies. They also purchased new curtains. They then went to another store and purchased playing cards and a 12-pack of beer.

The four then returned to the DeBerry home. Morrow sat down in the living room. The other three individuals cleaned and shampooed the carpets and walls. Ms. DeBerry removed blood-stained curtains and replaced them with the new curtains she had bought. Ms. DeBerry then threw the old curtains in a dumpster. After the three completed cleaning the house, they sat down and played cards. The DeBerrys and the appellant began talking about how they had "done away with" Milton Herron. The four individuals played cards until the sun came up. Only the appellant and Montrell DeBerry drank the beer.

Two days later Morrow was arrested and taken to the sheriff's department, where he gave a statement. During the time he was being held in the juvenile detention center he had at least one conversation with the appellant. Morrow testified at trial that the appellant attempted to persuade him not to tell the truth about his involvement in the case. Morrow acknowledged that he eventually reached a plea agreement in the case, and pled guilty only to the offense of being an accessory after the fact of murder.

On cross examination Morrow acknowledged that because of the plea agreement he reached he was treated as a juvenile rather than being transferred to adult court for trial. He received complete probation of the sentence he was given. He also acknowledged that he was aware of previous trouble that existed between Montrell DeBerry and Mr. Herron, the victim, based on DeBerry's theft of ten pounds of marijuana from Herron. DeBerry appeared to be worried that Herron would attempt to harm him because of the theft. Morrow denied that he had assisted in the theft of the marijuana, but admitted he had smoked some of it.

Kenneth McCallister identified himself as a cousin of Brian Morrow. He testified that on the night of July 9, 1997, he was in the DeBerrys' neighborhood when he observed Brian Morrow walk from the back side of the DeBerrys' house and onto the driveway. The two spoke. McCallister then heard a gunshot come from inside the DeBerry residence. Morrow went on down the street. McCallister soon observed the appellant, Montrell DeBerry, and DeBerry's mother, leave the residence. The two men got into a dark pickup truck and drove away. Ms. DeBerry followed in a gold-colored car. Mr. McCallister did not observe when the individuals returned to the house.

McCallister testified that he was returning from the Sonic when these events occurred. He denied that he had been drinking or taking any drugs that day.

Deputy Donald McIntosh of the Madison County Sheriff's Department, testified that at about 3:39 a.m. on the morning of July 9, 1997, while on patrol, he observed a dark pickup truck on the side of the road. He stopped to investigate, and observed the deceased body of a male, wrapped in a blue quilt, in the bed of the pickup truck. McIntosh immediately called for an ambulance and crime scene investigators. He took some photographs, and later assisted Sergeant Jeff Fitzgerald and

Deputy Owen in taking other photographs. The deceased individual was identified as the victim, Milton Herron. Deputy McIntosh stayed until the criminal investigators had completed their tasks and the victim was removed. He then left the scene.

Deputy McIntosh testified that he did not recall whether the truck was dusted for fingerprints. He also did not personally engage in a search for footprints. He was not certain whether other investigators conducted such a search.

During Deputy McIntosh's testimony, the state offered into evidence a number of photographs. The defense objected to the admission of the pictures. The court sustained the objection as to several photographs, but allowed several others to be introduced into evidence.

Madison County Sheriff's Department Sergeant Jeff Fitzgerald testified that in the early morning hours of July 9, 1997, he received a request from Lieutenant McIntosh to come to Christmasville Road, where a dead man had been discovered in the bed of a pickup truck. A pocket knife was found on the person of the victim. Sergeant Fitzgerald confirmed that no attempt was made to take fingerprint imprints from the truck, because it had been raining that night.

Sergeant Fitzgerald identified a bullet that was recovered by Dr. Tony Emison from the body of the victim.

In the course of his investigation Sergeant Fitzgerald determined that the homicide had occurred at 203 Hickory Hills. He went to that scene to continue the investigation. Among the items of evidence he recovered at the scene were curtains, bone fragments found on the driveway, and blood observed in the same general location as the bone fragments. Sergeant Fitzgerald also identified photographs of mini-blinds, a window sill, wall and baseboard inside the residence, all containing blood. Sergeant Fitzgerald also observed a shampooing machine, which contained a liquid with a reddish tint. He noticed that the living room carpet appeared to be extremely wet.

Sergeant Fitzgerald testified that a butcher knife, a kitchen knife, and a revolver were all found at the Hickory Hills home. The revolver was a silver Johnson .22 caliber revolver. It was ultimately identified as having nothing to do with the case.

On cross examination Sergeant Fitzgerald confirmed that his department had not made any attempt to lift fingerprints from the pickup truck. That task was usually assigned to Investigator Mike Turner of the Jackson Police Department, who was better equipped to perform it. Officer Turner lifted partial fingerprints, but none were sufficient to send for testing. No request was made to check for fingerprints inside the house. Sergeant Fitzgerald also acknowledged that none of the shirts taken from the appellant tested positive for the presence of blood.

Greg Kesterson testified that in the early morning hours of July 9, 1997, he was returning home from vacation. While driving down Christmasville Road he observed a pickup truck on the road shoulder. Just before observing the truck he observed a beige-colored car traveling rapidly

toward town. He observed the truck parked in a peculiar position, partially extended into the open road, and still running. At that time he was unable to determine how many persons were in either the car or the truck.

Dalvin Albea testified that, on a day he believed was just after the murder, he engaged in a conversation with the appellant about a sawed-off shotgun the appellant had in his possession. The appellant asked Albea to take the gun to Montrell DeBerry's house. Albea complied and delivered the gun to the DeBerry house. He was not certain whether this activity occurred before or after Herron's murder. When Albea arrived at the DeBerry house no one was home, so he left the gun under the carport.

Samera Zavaro is the Memphis Crime Laboratory Supervisor of the Tennessee Bureau of Investigation. She is an expert in serology. Zavaro testified about the results of tests performed on a number of items submitted to the crime laboratory in this case. She identified positive results for blood in the steam vacuum wheels, an air vent, and curtain pieces. Other items submitted did not test positive for the presence of blood.

Dr. O. C. Smith is an expert in forensic pathology. He performed an autopsy on the remains of the victim, Milton Herron. Dr. Smith testified that Mr. Herron died from multiple injuries, including five gunshot wounds, three in the back of the left shoulder, one in the middle of the back, and one to the right side of the head. There was also a shotgun wound on the left side of the victim's abdomen. There were multiple small stab wounds to the right side of his face and neck. Dr. Smith also observed a minimum of seven blows to the right side of the victim's head, which were of sufficient force to tear the scalp, crush the skull, and expel the brain. Dr. Smith testified that the victim was alive at the time each gunshot wound, blunt trauma blow, and shotgun blast was inflicted upon his person. Bone fragments were missing from the victim's head. Dr. Smith identified two bone fragments recovered from the scene as being derived from an African-American. He testified that the victim did not sustain any defensive wounds. Dr. Smith was unable to determine exactly how many different people were involved in the infliction of the injuries to the victim. Dr. Smith acknowledged that he found a low blood alcohol content and remnants of marijuana in the victim's body.

Calvin Albea testified for the defense. He acknowledged that he was the brother of Dalvin Albea who had testified earlier. At about 10:00 p.m. on the night of July 8, 1997, he had just finished work and dropped in at the home of Teresa Grimes. He was standing outside the house talking to Ms. Grimes. He noticed a black Nissan belonging to Montrell DeBerry's father travel up and down the roadway several times. Later he saw a dark truck and Montrell DeBerry's mother's car travel down the road. He could not tell who was inside the truck, but saw only one head. Albea denied seeing Mr. Morrow or the appellant that evening.

The jury convicted the defendant of first degree murder, conspiracy to commit first degree murder, fabricating evidence, and unlawful possession of a weapon. A sentencing hearing was conducted December 7, 1999. The appellant was sentenced to life imprisonment on the conviction

for first degree murder. He received a sentence of twenty-four (24) years for conspiracy to commit first degree murder, a Class A felony. He received a sentence of five (5) years for tampering with or fabricating evidence, a Class C felony, and 1.5 years for possession of a deadly weapon with intent to use it in the commission of a felony, a Class E felony. The sentences were ordered to be run concurrent to one another.

## ANALYSIS

### A.    Accomplice Testimony

Appellant first contends that the evidence is insufficient to support his conviction for first degree murder. His primary assertion is that the conviction relies solely on the testimony of Brian Morrow, whom the appellant claims is an accomplice.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in the testimony in favor of the state. *See State v. Cazes*, 875 S.W. 2d 253, 259 (Tenn. 1994).

First degree murder is defined, in part, as the "premeditated and intentional killing of another". Tenn. Code Ann. §39-13-202(a)(1). An intentional killing occurs when it is the defendant's "conscious objective or desire to engage in" the killing or to cause death. *Id.* §39-11-302(a). A premeditated killing occurs when "done after the exercise of reflection and judgment". *Id.* §39-13-202(d). That is, "the intent to kill must have been formed prior to the act itself", although "it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time". *Id.* "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine if the accused was sufficiently free from excitement and passion as to be capable of premeditation". *Id.*

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first degree murder may be shown by circumstantial evidence". *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). And, the jury may infer premeditation from the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our Supreme Court has enumerated several factors that may support the existence of premeditation and deliberation, including: (1) declarations by the defendant of an intent to kill, (2) evidence of procurement of a

weapon, (3) the use of a deadly weapon upon an unarmed victim, (4) the particular cruelty of the killing, (5) infliction of multiple wounds, (6) preparation before the killing for concealment of the crime, (7) destruction or secretion of evidence of the murder, and (8) calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000) (citations omitted).

In this case the appellant does not claim that no murder occurred; he simply asserts that there is not sufficient proof about his culpability to sustain his conviction.

The testimony of Brian Morrow makes it clear that the three other individuals at the DeBerry home, including the appellant, intentionally and premeditatedly committed the murder of Milton Herron. Motivated by a dispute over a pistol they had previously taken from the victim, the appellant and the DeBerrys formulated and discussed in advance their plan to murder him. They armed themselves and then invited the victim over. When the victim arrived he was searched to be certain he was unarmed. Once they had confirmed the victim had no weapon, Montrell DeBerry began shooting him and the appellant first stabbed him in the back, then hit him in the head with a sawed-off shotgun after he fell to the ground. DeBerry and the appellant then removed the body from the home, placed it in the victim's truck, and moved the truck to a distant location. When that task was completed they went to Wal-Mart, purchased cleaning supplies, returned to the DeBerry house, and methodically attempted to clean away all traces of the crime. They then calmly played cards and drank beer. This evidence of premeditation and deliberation is more than sufficient to justify a conviction for first degree murder. However, appellant claims that Morrow actually should have been deemed an accomplice, and therefore his uncorroborated testimony is not sufficient to support the conviction.

An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of the crime. *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1998) (citing *State v. Perkinson,* 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)); *Conner v. State,* 531 S.W.2d 119 (Tenn. Crim. App. 1975). When the facts are clear and undisputed concerning a witness' participation in the crime, whether the witness is an accomplice is a question of law for the court. When the facts are in dispute or susceptible to difference inferences, it is then a question of fact for the jury's determination. *Id.* at 123. Where a witness denies involvement in the crime, the question of whether he or she is an accomplice is one of fact to be submitted to the jury with proper instructions from the court on how to consider such testimony. *Anderson,* 985 S.W.2d at 16.

A criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury. *State v. Heflin*, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). Corroborating evidence need not be sufficient in and of itself to support a conviction, but it must fairly connect the defendant with the commission of the crime. *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992). Our courts have given us guidance in determining whether sufficient corroborating evidence is present:

There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Bigbee*, 885 S.W.2d at 803.

In this case the trial judge denied the appellant's request that the jury be allowed to determine whether Morrow was an accomplice. He found there was no evidence to support such an instruction.

The test generally applied in determining whether a witness is an accomplice is whether the alleged accomplice could be indicted for the same offense as the principal. *See e.g.*, *State v. Green*, 916 S.W.2d 827 (Tenn. Crim. App. 1995); *State v. Lawson*, 794 S.W.2d 363 (Tenn. Crim. App. 1990). "[I]n Tennessee, an accessory after the fact is not subject to indictment for the offense committed by his principal; but rather he is guilty of a separate and distinct offense . . . Thus under the generally accepted test, an accessory after the fact could not be considered as an accomplice within the rule requiring that the testimony of an accomplice be corroborated." *State v. Henning*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997) (citations omitted).

In this case, however, Morrow was originally indicted for first degree murder along with the other three individuals. He gained his status as an accessory after the fact by virtue of a plea agreement which required him to testify against his co-defendants. Morrow's own testimony indicates he did not participate in the principal case, but the record before this court does not indicate what other evidence, if any, might have been introduced had he gone to trial. Additionally, in order for the state to prevail on a charge of accessory after the fact it must introduce evidence that the principal has been tried and convicted of the crime. *State v. Hodgkinson*, 778 S.W.2d 54 (Tenn. Crim. App. 1989). At the time Morrow's plea was entered, the principals had not been tried.

We believe an instruction on accomplice testimony might have been appropriate in this case. However, we need not reach the question whether the trial court had the duty to provide that instruction under these facts because we find that, if the failure was error, the error was harmless. Even if Morrow was an accomplice, the record contains sufficient corroboration of his testimony. "Only slight circumstances are required to corroborate an accomplice's testimony". *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997).

Several witnesses provided corroborative testimony. Kenneth McCallister saw Morrow leave the house and then heard a gunshot. He later saw the appellant and Montrell DeBerry leave the house in the victim's truck, while Mrs. DeBerry followed in her car. The police ultimately found the victim's truck sitting on the side of the road with the victim's body in the back, wrapped in a blanket. Another witness saw a car similar to Mrs. DeBerry's speeding back toward Jackson from the location where the truck was found. Dalvin Albea testified that the appellant asked him to return a sawed-off shotgun back to the DeBerry residence. The forensic pathologist's testimony about the wounds inflicted on the victim are consistent with Morrow's testimony about their infliction. We conclude that sufficient corroborating evidence was presented at trial to support Morrow's testimony and sustain the jury's verdict, even if Morrow is deemed to have been an accomplice.

This issue is without merit.

## B.    Photographs

The appellant next argues that the trial court erred by allowing into evidence certain photographs of the victim. He contends that the photographs are too graphic and that their prejudicial effect outweighs their probative value. We disagree.

The Tennessee Supreme Court has determined that the admissibility of photographs is a matter within the discretion of the trial court, and the trial court's ruling concerning the admission into evidence of photographs "will not be overturned on appeal except upon a clear showing of abuse of discretion". *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). "To be admissible, photographs must be relevant to some issue at trial and their probative value must outweigh their own prejudicial effect, if any". *State v. Gann*, 733 S.W.2d 113, 115 (Tenn. Crim. App. 1987).

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence". Tenn. R. Evid. 401. However, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence". Tenn. R. Evid. 403.

We note that the appellant has not specifically identified in his brief which photographs introduced at trial are objectionable. However, in his motion for new trial and brief he alludes to the photographs of the victim. The record contains a discussion about three specific photographs of the victim at the time they were initially offered into evidence. Defense counsel noted his objection on the back of photographs ultimately admitted as Exhibits 4 - 6. We therefore have considered his arguments as they relate to Exhibits 4, 5, and 6.

Those photographs depict the victim as he was discovered in the back of his truck. The photographs are probative of the nature and extent of the victim's wounds. They depict trauma to

the head and body. They also are relevant to show the location of the body at discovery, and to establish the nature of its attempted concealment. While several are graphic in their display of brain matter and blood, they are very probative as to the brutality of the attack and the extent of force used. The court excluded other, presumably more gruesome photos. Because of the strong probative value of the photographs compared to their prejudicial effect, we conclude that the trial court did not abuse its discretion by admitting the photographs at issue into evidence. This issue is without merit.

### C. Motion for New Trial

The defendant finally contends that the trial judge erred in weighing the evidence on the motion for new trial. Tenn. R. Crim. P. 33(f) provides that the trial court "may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence". Our Supreme Court has stated that this rule "imposes upon a trial judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Notwithstanding, this rule does not require an explicit statement on the record that the trial court performed its duty. *Id.* Compliance with the rule is presumed when the trial court simply overrules a motion for new trial without comment; however, "where the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, an appellate court may reverse the trial court's judgment". *Id.*

In the instance case, the trial judge made the following comments at the conclusion of oral argument on the motion for new trial:

. . .

In summary, there was just an abundance of proof of the guilt. The guilt of the defendant in this case was overwhelming. The jury didn't take too long to decide it. They convicted him on everything. I think I'll let the sentences run concurrently. But there's a lot of evidence - overwhelming evidence - a strong case of the defendant's guilt in this case.

. . . [T]he evidence here, as I said, being repetition, is very strong for degrees of judgment of the verdict of the jury. The motion for a new trial is overruled and denied. . . .

The trial judge stated that the evidence of guilt was overwhelming. He expressed no disagreement with the jury's verdict. Because the trial court then denied the motion for a new trial, we presume that it properly exercised its role as thirteenth juror. Appellant has offered nothing that convinces us that the presumption does not apply in this case. This issue is without merit.

For the reasons set forth above, we affirm the judgment of the trial court in all respects.


_____
CORNELIA A. CLARK, SPECIAL JUDGE